[Cite as *King-Bey v. Greater Cleveland Regional Transit Auth.*, 2025-Ohio-1183.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

TERRY KING-BEY,  :

    Plaintiff-Appellee,  :

                  No. 114089

v.  :

GREATER CLEVELAND REGIONAL  :
TRANSIT AUTHORITY

    Defendant-Appellant.  :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 3, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-968973

---

### *Appearances:*

The Czack Hobbs Law Firm, Thomas J. Hobbs, and Michael W. Czack, *for appellee*.

Janet E. Burney, General Counsel, Deputy General Manager for Legal Affairs, Keith A. Ganther, Senior Counsel, and Brian R. Gutkoski, Associate Counsel II, *for appellant*.

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Appellant Greater Cleveland Regional Transit Authority ("GCRTA") challenges a jury verdict awarding appellee Terry King-Bey ("King-Bey") $75,000 in

noneconomic damages as a result of injuries sustained as a passenger on a GCRTA paratransit vehicle. After a thorough review of the facts and relevant law, this court affirms.

## I. Procedural History

{¶ 2} In September 2022, King-Bey filed a complaint against the GCRTA alleging negligence and negligent entrustment. According to the complaint, on or about May 14, 2018, King-Bey, who uses a wheelchair, was a passenger in a GCRTA paratransit vehicle when the paratransit driver "negligently, carelessly and improperly secured [King-Bey] and his wheelchair in the Paratransit vehicle" and operated the paratransit vehicle in "a careless and negligent manner, causing [King-Bey] and his wheelchair to partially fall over causing him to violently strike his head, face and body, causing serious and permanent injuries."

{¶ 3} The case proceeded to a jury trial on February 22, 2024. On February 27, 2024, the jury returned a noneconomic-damages verdict for King-Bey in the amount of $75,000.

{¶ 4} In March 2024, GCRTA filed a motion for judgment notwithstanding the verdict or alternatively a new trial or remittitur, which was denied in May 2024. In June 2024, the trial court granted a motion filed by King-Bey to tax costs to GCRTA.

{¶ 5} After GCRTA filed the instant appeal but before filing its appellate brief, GCRTA filed a motion in this court asking for a limited remand "for the sole purpose of rendering a reasoned opinion on the motion for remittitur . . . and

mandatory R.C. 2315.19 analysis." This court granted the motion, and in September 2024, the trial court issued the following journal entry:

> Defendant's motion for remittitur filed on 3/28/24 was denied on 5/29/24. Pursuant to [R.C.] 2315.19(B), "a trial court upholding an award of compensatory damages for noneconomic loss that a party has challenged as inadequate or excessive shall set forth in writing its reasons for upholding the award."

> The court finds that the jury's verdict of $75,000.00 in noneconomic damages was neither excessive nor against the manifest weight of the evidence. The evidence at trial from Plaintiff's testimony, a video of the incident, and plaintiff's medical expert's testimony was sufficient evidence for the jury to infer that the defendant GCRTA was negligent concerning plaintiff's ride on a paratransit bus, resulting in physical injury to plaintiff. The evidence presented by Plaintiff outweighed any rebuttal evidence presented by defendant. Plaintiff provided ample evidence of his injuries, symptoms, and the lingering effects that the incident on the paratransit bus caused. Plaintiff is quadriplegic. He fell over and was not able to right himself suffering injuries to his head, one of the few mobile body parts that a quadriplegic possesses. The jury took into consideration the extraordinary circumstances surrounding plaintiff's injuries; however, the jury was not a "runaway jury." The court finds that the jury's verdict was not the result of passion and prejudice, and was supported by the evidence presented.

{¶ 6} GCRTA, thereafter, filed a Civ.R. 60(B) motion titled "motion for relief from judgment and to comply with R.C. 2315.19(A)(2) and the appellate court's limited remand." Since no party has asked for a remand after the filing of this Civ.R. 60(B) motion, it remains pending as of the time of this appeal.

## II. Factual History

{¶ 7} Michael Oliver, the driver of the paratransit vehicle, testified that he had been employed by GCRTA since 1985 and has driven for paratransit since 1999. During his tenure as a paratransit driver, Oliver had been trained in wheelchair

securement once, in March 2010. Oliver testified that during his training, he was taught to check the tightness of the straps "[b]y giving a tug on them and it retains itself. It retains tension. It retains the tension itself by tugging on it. It locks." (Tr. 334.)

{¶ 8} Oliver stated that he receives his assignments for the day in the morning, and though an assignment includes the passenger's name, it does not detail the nature of the passenger's disability. He did not recall transporting King-Bey prior to this incident. On the morning of the incident, Oliver was operating a minivan and picked up King-Bey from a nursing home in Lyndhurst. Oliver testified the minivan is a "smaller" paratransit vehicle, and testified that, based on his experience, a larger paratransit vehicle would have been better for King-Bey. He acknowledged, however, that the type of vehicle is determined by GCRTA, not the driver or the passenger.

{¶ 9} Oliver was shown the surveillance footage from the van on the date of the incident. As he watched the video, Oliver testified that after ensuring that King-Bey maneuvered his chair on the ramp, he then "[t]r[ied] to have him position his self where I can get in and strap the straps down up on his chair and his self." (Tr. 326.) Oliver recalled asking King-Bey about the straps that "go around him" and King-Bey allegedly responded that he did not need them "because of that [breathing] tube he had." (Tr. 326.) Once King-Bey was positioned properly, Oliver began to use the straps that "connect to the floor" and "then connected to his chair . . . [w]herever he have hooks at. Most chairs have hooks onto them." (Tr. 330.) Oliver

testified that he did not recall where the particular hooks were on King-Bey's chair, but that he fastened two straps in the front and two in the back. While Oliver stated that it was policy to report when a passenger refused a belt, he testified that he did not report the refusal because "he received one seatbelt around him, but the other one, I didn't call it in to — he refused the other one." (Tr. 361.) When asked if he felt that King-Bey could be safely transported without the strap, Oliver responded that "Mr. King say he's rode on our buses many times before, so it was Mr. King's choice whether he decided he wanted to go or he didn't want to go." (Tr. 362.) Oliver testified that when he finished strapping in King-Bey, he made sure his straps were down, and placed King-Bey's fare in the fare box that was directly to the left of King-Bey, sort of behind Oliver's seat.

{¶ 10} During the drive, while turning from Brainard Road onto Cedar Road, Oliver realized that King-Bey had "brushed against [his] . . . right side." (Tr. 338.) He denied that King-Bey's head hit the fare box. Oliver immediately stopped the vehicle on Cedar Road. At 8:41:50 in the surveillance video, Oliver is seen attempting to place King's body upright. Oliver testified that he had asked King-Bey what he needed to do, and King-Bey told him to "pull him up from his mid section," and "take out his earpiece." (Tr. 340-341.) Oliver asked King-Bey if he needed EMS or medical assistance, and King-Bey relayed that he did not because "[h]e was going to Metro, so he would take care of it over at Metro." (Tr. 341-342.)

{¶ 11} Oliver testified that at 8:43:44 in the video, King-Bey was saying something about the straps coming up, prompting Oliver to check them again and

confirm that all of the straps were tight. Oliver called his dispatcher to report the incident, and then proceeded with transporting King-Bey to his scheduled appointment.

{¶ 12} After King-Bey's testimony, the parties stipulated that the GCRTA Transit police report would be read into the record, the contents of which provided:

> On Monday, May 14th, 2018, Officer Sycz . . . and Patrolman Davis . . . were assigned to the central zone in marked unit 971. At approximately 11:28 hours we responded to 4229 Pearl Road for Terry King-Bey that stated he was suffering from a head injury from an accident that occurred on a paratransit coach earlier that day.
>
> When we arrived at the location, staff advised us, King-Bey was transported to Metro main campus on West 25th. . . . So after arriving and speaking with King-Bey, he told the officers the following:
>
> At approximately 8:35 hours he was picked up by a paratransit coach from the location of 1575 Brainard Road. At approximately 8:40 hours, the driver of the coach made a right turn from Brainard onto Cedar Road.
>
> During that time, the chair he was sitting tilted, and he fell out of the chair, striking his head against the fare box.
>
> King-Bey stated the left side of his face made contact with the fare box. After the incident occurred, he felt ringing in his head. King-Bey also stated he felt pressure and cramping in his neck.
>
> After the driver assisted him off, off the fare box, he . . . notified dispatch and EMS.

(Tr. 396-397.)

{¶ 13} Dr. Todd Hochman, King-Bey's medical expert, testified via a prerecorded video deposition that was played for the jury. Dr. Hochman testified that he performed a review of King-Bey's medical records and provided an overview

of King-Bey's treatment associated with this incident. After the incident, King-Bey presented for his scheduled appointment with his long-time spine specialist complaining of left-sided facial pain and neck pain. The specialist did not go forward with the scheduled appointment and sent King-Bey to the emergency department instead, where he was not admitted but was discharged with follow-up instructions. As a result of this incident, Dr. Hochman testified that King-Bey required chiropractic care, continuous treatment for his neck pain, and had to present to an ear, nose, and throat doctor, as well as an oral surgeon. Dr. Hochman concluded that "King-Bey sustained a cervical or neck strain, cervical or neck sprain, a facial contusion, and myofascial pain syndrome" as a result of the incident, which includes TMJ complications. Dr. Hochman noted that King-Bey had not had any myofascial pain issues or had any neck complaints prior to this incident. Dr. Hochman relayed that his prognosis for King-Bey was guarded because the myofascial pain syndrome would be chronic and require different therapies in the future to treat the conditions.

{¶ 14} Dr. Hochman opined that this injury was more debilitating to King-Bey, who had suffered a previous spinal cord injury that rendered him a person with quadriplegia. King-Bey did not have the ability to lift himself when he tipped over, the way a person without quadriplegia would, and this incident therefore put more strain on his neck because he did not have the assistance of other muscles to lift himself.

{¶ 15} Dr. Hochman acknowledged that in August 2018, King-Bey had another incident while being transported by My City/Provide A Ride, but after

reviewing King-Bey's records, Dr. Hochman opined that this incident did not result in any injuries to King-Bey.

{¶ 16} Following Dr. Hochman's testimony, the videotaped deposition of Dr. Douglas Gula, GCRTA's medical expert, was also played for the jury. Dr. Gula testified that he performed an independent medical examination of King-Bey at GCRTA's request. Dr. Gula opined that the TMJ complaints that King-Bey had were unrelated to the paratransit incident because, after viewing the surveillance from the minivan, "it's hard to say that there was evidence of any TMJ injury in this case." Dr. Gula spoke in detail about King-Bey's preexisting conditions and prior surgeries, which included neck surgery in April 2015. Dr. Gula also went through the video surveillance of the incident and opined that King-Bey did not hit his head on the fare box, and, after examination of the records from the emergency department and his own examination of the patient, opined that there were no abnormalities "involving the face, the right ear, the right eye, the neck, the upper right arm, the left side of the neck, the right side of the neck, the left ear, the left eye, or nose."

{¶ 17} Dr. Gula opined that this incident resulted in a "soft tissue injury to the cervical spine" but did not "cause a myofascial injury to the cervical and/or thoracic region." Dr. Gula also opined that this incident "did not cause persistent neck, jaw, [or] face pain," and that those were related to a preexisting condition. He also testified that the treatment provided by Allied Health was "excessive in nature." Regarding the incident that occurred in 2018 on a My City/Provide A Ride van, Dr. Gula opined that this August 2018 incident had reinjured King-Bey.

{¶ 18} King-Bey testified as a witness. He told the jury that he was 64 years old, from the Cleveland area, attended Benedictine High School, and was employed as a security guard, disc jockey, and naturopath until he was involved in a car accident in 2015 that paralyzed him.

{¶ 19} He testified that after the 2015 accident, he had "normal feeling" from his neck to the top of his head; in other words, this area of his body was unaffected by the 2015 accident. (Tr. 523.) At the time of this incident, King-Bey was using a "sip and puff" wheelchair due to the nature of his disability, which uses a sort of straw-like device to move the chair without his hands.

{¶ 20} King-Bey testified as the jury observed the video that captured the incident, starting with Oliver's initial pickup. King-Bey's testimony regarding the strapping process was consistent with Oliver's, until the issue of the shoulder strap arose. King-Bey testified that he did not recall having a discussion with Oliver about the shoulder strap or refusing to use it. When asked if he had ever had shoulder straps put on before in the paratransit vehicle, he responded, "Oh, sometimes." (Tr. 550.) He clarified that those shoulder straps would typically be in the bigger buses, as distinct from the minivan that he was riding in that day. He described that typically, he wore the shoulder strap the "[m]ajority of the time . . . unless I tell them, 'I don't want to put it on. Use my belt.' Then they have to call dispatch and let them know that I'm using my own seatbelt." (Tr. 550.) He denied that this course of events happened this time. King-Bey stated that typically, when he used the sip-and-puff wheelchair, he was still able to wear the shoulder belt, explaining that

"[w]henever I have had the sip-and-puff in my mouth and they go to put the strap across me, they take the sip-and-puff and pull it out, pull it back once they get the strap on me." (Tr. 566.) He testified that he is still able to use the sip-and-puff if a shoulder strap is across him.

{¶ 21} King-Bey testified that before Oliver even began to drive the vehicle, he questioned Oliver whether he "pull[ed] on the straps? . . . 'Cause you didn't pull on that strap on the front on the right." (Tr. 554.) According to King-Bey, Oliver responded that the straps were self-locking and would latch automatically.

{¶ 22} When the video proceeded to the actual event where King-Bey tilted out of his wheelchair, King-Bey commented that the wheelchair "didn't fall over" but clarified that "you can look at the headrest and you can look at the chair and see the body of the chair is not back against the wall to the right, as it once was," and that it was sort of tilted. (Tr. 559.) King-Bey testified that he hit the left side of his face, his ear, and his jawbone against the fare box, and that he was "scared . . . fearful . . . frightened" and testified that the fare box stopped him from hanging further over the edge of his wheelchair. (Tr. 562.) He denied making any contact with the driver's body.

{¶ 23} At 8:41:36 in the video, King-Bey testified that he asked the driver, "Can you get me up off this box?" and "Can you please get up and put your arm up under me and force me over, please, to get me off of that box?" (Tr. 564.) He testified that he urged the driver to pull over. After pulling over, Oliver put him upright and, according to King-Bey's testimony, "pulled the right latch" to make it

tighter (Tr. 568-569.) He stated that he denied immediate medical assistance because he was on his way to MetroHealth and felt that he could just have everything checked out while he was there.

{¶ 24} King-Bey described his feelings as "fear . . . my ear was hurting . . . . I started hearing a little ringing, and my ear felt sore and my jaw. Shoulder felt a little agitated." (Tr. 570.) Since the incident, King-Bey described that he can only sleep on his right side because lying on the left side creates a pressure along the side of his face and neck and that he is unable to turn himself in his sleep, which creates complications and disturbances in his sleeping patterns. He also testified that the injuries prevented him from being able to fully use his sip-and-puff wheelchair and that he has trouble chewing certain snacks, like peanuts.

{¶ 25} King-Bey stated that the treatments he received from Allied Health, which consisted of heat, vibration treatments, and acupuncture, were "helping [him] tremendously" and gave him relief. (Tr. 589.) He also testified that he received injections in his neck from Dr. Morton, which he had never needed before this incident, and testified that he continued to receive them at the time of trial every "two and a half to four months." (Tr. 600.) He received Botox injections from a different doctor, and began seeing Dr. Freedom Johnson for ear, nose, and throat complications. He testified that Dr. Johnson took X-rays and eventually sent him to the dental surgery department, where King-Bey was informed "that [he] would need to get surgery if [he] wanted to stop the pain and the way my jaw would kinda jump or move when I'm chewing on this side . . . . So the other alternative was to try

getting injections." (Tr. 595.) He elected to get injections in his mouth, which he only did once because it "hurt too bad" and stayed sore for days. (Tr. 596.)

{¶ 26} King-Bey also testified regarding the subsequent incident that occurred on August 2, 2018, in a My City/Provide A Ride vehicle. King-Bey described that situation as follows:

> I got picked up. Where was I at? Anyway, I was on MyCity, and they had to do a pickup at Target on — I think it was West 117th. And I had to get off the bus. They put somebody else on in front of me. And when I got back on, they put a few latches on me. And when I was riding, I hit my head. The chair turned, and the top part of my head hit — I'm in an old-fashioned van with the high roof. And when it turned — chair turned, the top of my head hit the connection between the top roof part and the regular roof.

{¶ 27} He testified that this incident caused pain to the right side of his head, that he did not make a report, that he did not request EMS, and that he felt that it "wasn't a big deal." (Tr. 598.) Regarding medical records that stated he "re-injured" his neck during this incident, he stated that he never complained about it, but remembers telling one of his providers about the incident without offering complaints or seeking treatment. He did admit, however, to filing a lawsuit regarding the matter, but the lawsuit was dismissed and he never received any payment or compensation for the incident.

{¶ 28} GCRTA's appeal contests the verdict, the trial court's denial of GCRTA's motion for judgment notwithstanding the verdict including the entry made during the limited remand, and the trial court's grant of King-Bey's motion to tax costs to GCRTA. GCRTA assigns four errors for our review:

I. The trial court erred by denying GCRTA's motion for judgment notwithstanding the verdict or, alternatively, motion for a new trial, or remittitur.

II. The trial court erred in failing to rule on GCRTA's objections to the improper closing arguments by appellee's counsel.

III. The trial court erred by not directing a verdict in GCRTA's favor.

IV. The trial court erred by not instructing the jury on GCRTA's apportionment and intervening/superseding cause issues pertaining to non-party, Provide A Ride incident while allowing all of Dr. Hochman's purported expert opinions, to reach the jury, despite the fact Dr. Hochman never treated appellee personally, lacked knowledge surrounding the circumstances of the alleged accident, and relied on the opinions of non-testifying physicians that GCRTA could not cross examine.

{¶ 29} In its first assignment of error, GCRTA contends that the trial court erred in denying GCRTA's motion for judgment notwithstanding the verdict or, alternatively, motion for a new trial, or remittitur.

{¶ 30} Motions for judgment notwithstanding the verdict and directed verdicts require a reviewing court to apply the same test. *Kanjuka v. MetroHealth Med. Ctr.*, 2002-Ohio-6803, ¶ 14 (8th Dist.), citing *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90 (1987). Therefore, we will address this portion of the assignment of error when discussing GCRTA's third assigned error related to the trial court's alleged error in failing to direct a verdict in favor of GCRTA.

{¶ 31} GCRTA's motion for new trial and alternative motion for remittitur were premised upon R.C. 2315.19(A),[1] which provides that "[u]pon a post-judgment

---

[1] Like R.C. 2315.19(A), to order a remittitur under common law, the trial court must find that "(1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the

motion, a trial court . . . shall review the evidence supporting an award of compensatory damages for noneconomic loss that the defendant has challenged as excessive." Noneconomic loss is "nonpecuniary harm that results from an injury or loss to person or property that is a subject of a tort action, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss." R.C. 2315.18(A)(4). R.C. 2315.19(A) provides that a review of compensatory damages for noneconomic loss "shall include, but is not limited to," the following factors:

> (1) Whether the evidence presented or the arguments of the attorneys resulted in one or more of the following events in the determination of an award of compensatory damages for noneconomic loss:
>
> (a) It inflamed the passion or prejudice of the trier of fact.
>
> (b) It resulted in the improper consideration of the wealth of the defendant.
>
> (c) It resulted in the improper consideration of the misconduct of the defendant so as to punish the defendant improperly or in circumvention of the limitation on punitive or exemplary damages as provided in section 2315.21 of the Revised Code.
>
> (2) Whether the verdict is in excess of verdicts involving comparable injuries to similarly situated plaintiffs;
>
> (3) Whether there were any extraordinary circumstances in the record to account for an award of compensatory damages for noneconomic loss in excess of what was granted by courts to similarly situated

---

reduction in damages." *Wightman v. Conrail*, 86 Ohio St.3d 431, 444 (1999). GCRTA has not discussed this standard for remittitur and cites strictly to R.C. 2315.19(A) in its brief, so we need not address it.

plaintiffs, with consideration given to the type of injury, the severity of the injury, and the plaintiff's age at the time of the injury.

{¶ 32} If the trial court upholds an award of compensatory damages for noneconomic loss that has been challenged under R.C. 2315.19, it "shall set forth in writing its reasons for upholding the award." R.C. 2315.19. The statute requires that appellate courts use a de novo standard of review when considering decisions made under this section on appeal. R.C. 2315.19(C).

{¶ 33} GCRTA contends that the trial court, even after the limited remand, did not comply with R.C. 2315.19 because it did not "review the evidence" or did it "set forth in writing its reasons for upholding the award" because the trial court's written explanation did not specifically address every factor. We do not agree with GCRTA's contention. The plain text of R.C. 2315.19 requires only *review* of the enumerated factors and is not limited to the listed factors. Moreover, R.C. 2315.19(A)(1) provides that the inquiry for subsections (a) through (b) is "whether the evidence presented or arguments of the attorneys resulted in *one or more of the following events* in the determination of an award . . . ." (Emphasis added.) The trial court, in reviewing the briefing on the matter, presumably reviewed all of these factors to the extent that the parties briefed them, which includes GCRTA's briefing that included "similarly situated" plaintiff's verdicts. Further, the trial court provided a written explanation including its reasons for upholding the award. We therefore cannot find that the trial court failed to comply with the statute or our remand order.

{¶ 34} R.C. 2315.19 requires us to perform our own de novo review of the evidence and enumerated factors. Our own review of the evidence and arguments presented by both King-Bey and GCRTA leads us to conclude that the trial court did not err in upholding the jury's noneconomic damages verdict of $75,000. We will briefly address each of GCRTA's specific arguments.

{¶ 35} GCRTA claims that the trial court did not reveal the verdicts of "similarly situated" plaintiffs, or properly consider the plaintiff's age, life expectancy, and preexisting injuries. However, R.C. 2315.19(A)(2) and (3), together, provide that a court is to review verdicts involving similarly situated plaintiffs *and* whether "there were any extraordinary circumstances in the record to account for an award of compensatory damages in excess" of those received by similarly situated plaintiffs, and requires specific consideration of the severity of the injury and plaintiff's age at the time of the injury. Taking all of this into account, however, we find that the noneconomic damages were reasonable in the context of "similarly situated" plaintiffs when considering the "extraordinary circumstances" surrounding this case. King-Bey is a person with quadriplegia who is solely reliant on companies such as GCRTA for transportation. He resides in an assisted living facility and receives 24-hour care with showering, getting into bed, and feeding himself. Despite his disability, he tries to maintain the same quality of life that he had prior to becoming a person with quadriplegia. He still DJs at "some festivals or things in the park," including "a party the other week at the Mediterranean party center," an event "at the Irish American Pub," "Thursdays and Sundays at a place

that's 40 and over crowd," and "another place on Fridays." (Tr. 532-533.) He also goes to the local library and does various speaking engagements.

{¶ 36} He testified that because of this incident, he cannot sleep on his left side for very long, and he requires assistance turning himself at night. To achieve relief from the soreness caused by this accident, he received treatment at Allied Health for over 100 appointments. Dr. Hochman opined that these were medically necessary, but Dr. Gula opined that these were "excessive." King-Bey presented to numerous medical professionals, received injections, and underwent X-rays and scans. He still receives injections that Dr. Hochman attributed to this incident. Surely, the fact that King-Bey is a person with quadriplegia presents an "extraordinary circumstance" warranting damages that may be higher than "similarly situated" plaintiffs, because one would be hard pressed to find a similarly situated plaintiff. As exhibited by the evidence above, an injury to a person with quadriplegia is certainly more debilitating and detrimental than the same injury to a person with full mobility, especially if the patient is required to appear for numerous appointments and undergo treatments that may not be comfortable. Even Dr. Gula, the defense's medical expert, acknowledged as much, stating "a typical soft tissue injury to the cervical spine would resolve in the course of about 104 days . . . but if you combine someone who's had a previous fusion, C3 to C6, it may take a longer period of time to fully recover from these soft tissue injuries."

{¶ 37} It is not unreasonable that a jury concluded that King-Bey, as a person with quadriplegia, suffered pain, damage, suffering, and inconvenience compensable in the amount of $75,000.

{¶ 38} GCRTA also argues that the jury was misguided by improper "anchoring" and "per diem" arguments in counsel's closing statements, suggesting a value of $125,000 for King-Bey's noneconomic damages. GCRTA does not cite to any Ohio case law demonstrating that opposing counsel's closing statements constituted improper anchoring by suggesting a $125,000 value for King-Bey's noneconomic damages. The closing remarks even clarified to the jury that "[y]ou are free to give more, to give less. You are free to use whatever formula, whatever life's wisdom, collective experience you have to come up with a number. There's no science to it. There's not going to be a right or wrong number, it's going to be your number and I'm just giving you an example." (Tr. 990.) And, in fact, the jury did *not* award King-Bey $125,000 — the jury awarded him $50,000 less than this amount, demonstrating that they were not inflamed or incensed by King-Bey's counsel's closing argument. The jury heard all of GCRTA's responsive arguments and presumably factored them into their verdict, including suggestions that King-Bey's head did not hit the fare box, that there was no visible evidence of an injury, that King-Bey's sudden need for more medical treatment is not attributable to this incident but the prior incident that rendered him a person with quadriplegia, and that there was another incident on a different transit vehicle in August 2018.

{¶ 39} Based on the foregoing and our de novo review, GCRTA's first assignment of error is overruled; the trial court did not err in its decision to maintain the jury's verdict.

{¶ 40} In its second assignment of error, GCRTA argues that the trial court erred in "failing to rule on GCRTA's objections to the improper closing arguments." GCRTA, after objecting twice to King-Bey's characterizations of Dr. Gula, was instructed by the court, "Stop. If you have any objections, we'll do it at the side. I don't like objections to interrupt closing arguments." (Tr. 978.) Nonetheless, GCRTA's counsel continued to object during closing argument, and the issue of the objections was never revisited. After each objection, the court allowed King-Bey's counsel to continue with his closing argument, indicating that the trial court overruled GCRTA's objections.

{¶ 41} Trial counsel is afforded wide latitude during the presentation of closing arguments. *Pang v. Minch*, 53 Ohio St.3d 186 (1990), paragraph two of the syllabus. "[W]hether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court." *Id.* at paragraph three of the syllabus. This decision will not be reversed on appeal absent an abuse of discretion. *Id.* at paragraph one of the syllabus.

{¶ 42} GCRTA particularly takes issue with the portion of closing arguments that focused on GCRTA's expenses in defending this lawsuit, particularly the amount paid to Dr. Gula as an expert, and claims that this improperly confused the jury on the issue of liability and damages. We do not agree. GCRTA also takes issue

with the repeated mentions of King-Bey's 2015 incident that caused him to become a person with quadriplegia.

{¶ 43} Upon review, we do not find that any of the disputed statements were prejudicial towards the jury in rendering a verdict or would have changed the outcome of the trial. Once again, we note that the jury awarded less than it was encouraged to, after being urged by King-Bey's counsel to award the number that he believed was appropriate given all of the evidence presented.

{¶ 44} Moreover, during GCRTA's closing arguments, it addressed both issues that it raises now on appeal. It addressed Dr. Gula's expenses and told the jury, "[I]f somebody is making a claim against you . . . You dispute injury, a car repair, whatever, you're going to hire somebody to look at that case independently and give you their impressions of what they're seeing or why the case is or isn't worth what that person is claiming it is" and "I think you see why we had to retain Dr. Gula, because otherwise they would lead you to believe that this case, just the pain and suffering alone is $125,000[.]" (Tr. 1012-1013.) Additionally, GCRTA reiterated multiple times that it is not and should not be responsible for the injuries that King-Bey suffered in 2015.

{¶ 45} In reviewing the closing arguments as a whole, coupled with the instructions given to the jury, we cannot say that the trial court abused its discretion in how it elected to handle counsel's objections, nor did it abuse its discretion in overruling all of GCRTA's objections. GCRTA's second assignment of error is overruled.

{¶ 46} In its first and third assignments of error, GCRTA argues that the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict.

{¶ 47} Because motions for directed verdict and judgment notwithstanding the verdict test the legal sufficiency of the evidence, we review them de novo. *Day v. Rochling-Glastic Composites, L.P.*, 2020-Ohio-1027, ¶ 13 (8th Dist.), citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 2002-Ohio-2842, ¶ 4. A motion for directed verdict "tests the sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses." *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119 (1996). A motion for a directed verdict is properly granted when the court, "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4).

{¶ 48} On appeal, GCRTA premises these assignments of error on King-Bey's alleged failure to produce testimony from an expert witness regarding securement of King-Bey's wheelchair.

{¶ 49} Evid.R. 701 provides that witness testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 50} GCRTA does not cite any case law suggesting that strapping a wheelchair into a vehicle is "beyond the knowledge or experience possessed by lay persons" or requires "specialized knowledge, skill, experience, training, or education . . . ." or "is based on reliable scientific, technical, or other specialized information . . . ." Evid.R. 702 (Testimony by Experts). Indeed, even the driver of the paratransit vehicle testified that he had only received one specific training regarding strapping wheelchairs into the vehicle, which demonstrates that such activity is not highly technical or specialized. King-Bey established at trial that he had been in the paratransit vehicles probably thousands of times since 2015 and therefore, he was capable of offering his opinion that he was not strapped in securely by the driver, and that he notified the driver of this fact because, based on his prior experiences, he felt that one of the straps was loose.

{¶ 51} Finding that expert testimony was not required regarding strapping the wheelchair into the paratransit vehicle, we overrule GCRTA's first and third assignments of error to the extent they contend that the verdict was premised on insufficient evidence.

{¶ 52} In its final assignment of error, GCRTA introduces numerous alleged errors relating to the jury instructions and interrogatories regarding the August 2018 incident as a superseding/intervening cause and the apportionment of damages to the alleged tortfeasors in the August 2018 incident. GCRTA also challenges Dr. Hochman's review of King-Bey's medical records and Dr. Hochman's alleged lack of expertise.

{¶ 53} Decisions surrounding the admission of jury interrogatories and jury instructions are reviewed for an abuse of discretion. *Professional Solutions Ins. Co. v. Novak, L.L.P.*, 2020-Ohio-4829, ¶ 61 (8th Dist.); *State v. Kimmie*, 2013-Ohio-4034, ¶ 69 (8th Dist.).

{¶ 54} Regarding the subsequent August 2018 incident, we find that GCRTA's arguments are unpersuasive. While we recognize that the actual complaint filed by King-Bey in response to the August 2018 matter was not provided to the jury over GCRTA's objection, Interrogatory C, which was placed in the interrogatories over King-Bey's objection, asked the jury, "Was the negligent operation of the vehicle of My City/Provide A Ride a direct and proximate cause of any injury for plaintiff?" Interrogatory D, which was again placed in the interrogatories over King-Bey's objection, asked the jury, if six or more of them answered yes to Interrogatory C, "Do you find by a preponderance of the evidence that the subsequent August 2, 2018 motor vehicle accident directly and proximately intervened and removed the effects of any [GCRTA]'s negligence from the May 14, 2018 accident and became itself a proximate cause of any cervical spine complaints, disability, medical treatment that the plaintiff received after August 2nd of 2018?" If six or more jurors answered in the affirmative, then the jury was to move on to Interrogatory E, which was also included over King-Bey's objection, which ordered the jury to "State the percentage of negligence of Defendant [GCRTA], the negligence of My City/Provide A Ride that was a direct and proximate cause of the Plaintiff's injuries."

{¶ 55} Eight jurors found that the August 2018 incident did not cause any injury to King-Bey; thus Interrogatories D and E went unanswered. The jury *was* instructed and given interrogatories asking them to consider the intervening nature of the August 2018 offense. Moreover, our examination of the transcript indicates that GCRTA prominently utilized the August 2018 incident as part of its defensive strategy, including significant cross-examination, opening and closing arguments, and requesting incorporation of the above interrogatories. We find no error in the trial court's decisions regarding the jury instructions and interrogatories.

{¶ 56} We next turn to GCRTA's complaints about Dr. Hochman: namely, that Dr. Hochman did not perform a medical examination of King-Bey, only reviewed his records; that Dr. Hochman "openly admitted that he did not have the requisite expertise to establish whether there was negligent securement" or "on other areas that King-Bey claimed he was injured in" and that he "cannot opine on proximate cause."

{¶ 57} Initially, we find no basis for GCRTA's claim that Dr. Hochman did not testify as an expert because he did not examine King-Bey physically, and only did a medical records review. Dr. Hochman's testimony was proper under Evid.R. 703, which provides that "[t]he facts or data in the particular case upon which an expert bases on opinion or inference may be those perceived by the expert or admitted into evidence at the hearing." Dr. Hochman testified that he reviewed all of King-Bey's medical records that were admitted at the trial and provided to the jury during deliberations. This includes the emergency room records and records of

other treating physicians that GCRTA's counsel cross-examined him about during the video deposition.

{¶ 58} Moreover, we do not find that Dr. Hochman's testimony was admitted for purposes of demonstrating negligent securement or proximate cause. Dr. Hochman was called as a medical expert whose testimony went to the injury sustained by the incident. Indeed, as we concluded above, securing the wheelchair did not require expert testimony, and the jury heard opinions about the security of the wheelchair from both the driver and King-Bey, and indeed could observe it themselves in the video from the van.

{¶ 59} Accordingly, GCRTA's final assignment of error is overruled in its entirety.

### III. Conclusion

{¶ 60} After thorough and careful consideration of GCRTA's brief and the record before us, we find no error in either the jury's verdict or the trial court's rulings, before, during, and after trial.

{¶ 61} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, PRESIDING JUDGE

DEENA R. CALABRESE, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)